**Juan ROLDAN, Petitioner,**

v.

**Christopher ARTUZ, Superintendent, Respondent.**

**No. 97CIV.2562(DAB)(AJP).**

United States District Court, S.D. New York.

Jan. 6, 2000.

Juan Roldan, Stormville, NY, pro se.

Jennifer Correale, Asst. District Attorneys, Bronx County, Bronx, NY, for Respondent.

## ORDER

BATTS, District Judge.

On July 22, 1999, Magistrate Judge Andrew J. Peck issued a Report and Recommendation. The Petitioner filed an objection on July 29, 1999. Magistrate Judge Peck denied Petitioner's habeas corpus petition on the merits.

The Court has reviewed the Plaintiff's objection, which disputes no specific proposed finding or recommendation. The Court finds Petitioner's objection to be without merit. Having reviewed the Report and Recommendation and finding no clear error on the face of the record, the recommendations of Magistrate Judge Peck are hereby accepted and the Report

and Recommendation dated July 22, 1999, is hereby adopted in its entirety. *See* Local Civil Rule 72, 28 U.S.C. § 636.

Pursuant to 28 U.S.C. § 1915(a), any appeal from this Order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962)

SO ORDERED.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Petitioner Juan Roldan was convicted of second degree murder in connection with the shooting of cab driver Roscoe Cummings. Roldan's habeas petition asserts three grounds for relief: (1) his guilt was not proven beyond a reasonable doubt (Pet.¶ 12(A)), (2) his line-up identification was impermissibly suggestive (Pet. ¶ 12(B)), and (3) the trial court improperly admitted uncharged crimes evidence (Pet. ¶ 12(C)).

For the reasons set forth below, I recommend that Roldan's habeas petition be denied on the merits.

### FACTS

*Trial Evidence: Prosecution Case*

On the morning of July 6, 1985, cab driver Roscoe Cummings was shot and killed in the Bronx during a robbery.

At approximately 7:30 p.m. on July 5, 1985, David Gonzalez Rodriguez told George Rivera that he was going to have cab drivers pick him up in Manhattan and take him to the Bronx, or vice versa, and rob them. (Trial Transcript [ "Tr."] 171–72.) Rodriguez told Rivera to leave the door to 626 Cypress Avenue in the Bronx open so that Rodriguez could enter the building quickly after the robberies. (Tr. 171–72.) Rodriguez showed Rivera a small black handgun that he planned to use in the robberies. (Tr. 172–73; People's Ex. 8.)

At approximately 12:45 a.m. on July 6, 1985, Sean Bruce and Marilyn Rivera (George Rivera's sister) witnessed three men run from a yellow medallion cab that stopped near 140th Street and Cypress Avenue in the Bronx into a vacant lot adjacent to the apartment building at 626 Cypress Avenue. (Tr. 98–99, 103–04, 138–39, 141–48.) When the cab stopped, Bruce heard two to three gunshots and saw three people run from the cab. (Tr. 141–42.) Ms. Rivera heard two of the men yell "David, hurry up," then heard a door slam and saw a light go on in Rodriguez's apartment. (Tr. 104–07.)

The yellow cab crashed into a fence at 142nd Street and Jackson Avenue, approximately three blocks from David Rodriguez's building. (Tr. 72, 76–77, 90–93.) The driver, Roscoe Cummings, told the police that he had been robbed and shot at 140th Street and Cypress Avenue by three male Hispanics in their twenties. (Tr. 78–80, 91.) Cummings told the police that one of the men, wearing a yellow T-shirt and tan pants, was carrying a small, black, automatic gun. (Tr. 80.) Cummings told the police that he had picked up his assailants in Manhattan and driven them to the Bronx. (Tr. 80.) The police took Cummings to the hospital, where he died from a single gunshot wound to his back. (Tr. 81, 92, 193–95.)

Police officers recovered a .25 caliber automatic bullet from the back seat of the cab and an additional .25 caliber round of ammunition on the ground below the cab. (Tr. 81–83, 93–94.)

At 3:45 a.m., approximately two hours after Cummings was shot and robbed, a cab driver, Danyo Syoum, observed Roldan with a small Beretta handgun, People's Exhibit 8. (Tr. 152, 162.) Approximately one hour after Cummings was shot

and robbed, Sergo Abelard saw Roldan with a small, black, automatic pistol. (Tr. 226–32.)

The police arrested Roldan at approximately 3:45 a.m. and upon searching him, recovered a gun, People's Exhibit 8. (Tr. 114–15, 119–20.) At the time of his arrest, Roldan was with David Rodriguez. (Tr. 116–17.)

### Trial Evidence: Defense Case

Roldan's wife, Irma Roldan, testified that her husband regularly carried the gun, People's Exhibit 8, and that on the afternoon before Cummings was killed, she witnessed Roldan give the gun to Rodriguez. (Tr. 352–54, 357–58, 385–86, 389–91, 393–94.)

Irma Roldan also testified that she and Roldan were at his mother's house on the lower east side of Manhattan from 1:00 p.m. in the afternoon of July 5, 1985, until approximately 1:00 a.m. on July 6, 1985, fifteen minutes after Roscoe Cummings was shot. (Tr. 358–60, 364, 367, 369–70, 373–74, 395, 400.) Digna Arteaga, Roldan's mother, testified that at "[a]bout one o'clock" in the morning, Roldan woke her up to tell her that he was leaving her home. (Tr. 262, 264, 292–93, 295–96.) Willis Cruz testified that he left Arteaga's house with Roldan at 1:00 a.m. (Tr. 306–07, 326, 334, 337–39.) Arteaga, Cruz and Irma Roldan testified that Roldan was wearing a light blue shirt on July 5, 1985; Arteaga testified that Roldan did not own a yellow shirt. (Tr. 290, 339, 393, 397.)

### The Pretrial Wade Hearing

On May 19, 1986, a pretrial *Wade* hearing was conducted to determine whether the pretrial identification procedures were impermissibly suggestive. (*See generally* 5/19/86 *Wade* Tr.)[1]

---

1. The *Wade* testimony as to the show-up, which is not an issue here, was as follows: Officer Alberto Candelaria testified that at approximately 3:45 a.m. on July 6, 1985, cab driver Danyo Syoum flagged down Candelaria and his partner Officer William Torres, and Syoum reported that he was robbed two

minutes earlier by two male Hispanics, one of whom had a gun. (*Wade* Tr. 31–40, 69–70.) Syoum described the robbers and said they were in the subway station on Allen and East Houston. (*Wade* Tr. 33, 40, 52, 69–70.) The officers and Syoum entered the subway station to look for the robbers. (*Wade* Tr. 33,

At approximately 8:00 a.m. on Saturday July 6, 1985, some four hours after Roldan's arrest, Officer Thomas Wray contacted cab driver Sergo Abelard and asked him to come to the station house to view a lineup. (*Wade* Tr. 4–5, 7.) After he saw what Roldan and Rodriguez looked like, Officer Wray went "on a canvass of the neighborhood, attempting to get ten fillers for these ... line-ups." (*Wade* Tr. 8, 15.) Officer Wray testified that it was very difficult to find fillers on a Saturday morning and that he spent "quite a bit of time in the street." (*Wade* Tr. 8, 24–26.) Officer Wray selected the fillers on the basis of "necessity." (*Wade* Tr. 15.)

Roldan was in a separate lineup with four fillers. (*Wade* Tr. 8, 12, 15–16.) The men were seated during the lineup. (*Wade* Tr. 8, 16; *see also* 6/30/97 Affidavit of ADA Jennifer Correale, Ex. 13: Lineup Sheet.) Two of the fillers were 34 and 35 years old, while Roldan was 22; two other fillers were 22 and 25. (*Wade* Tr. 15–16; Correale Aff. Ex. 13.) Two of the fillers were 5′4″ and 5′2″, while Roldan is 6 feet tall, but Officer Wray considered them proper fillers under the circumstances since the lineup was conducted in a seated position; also, the other two fillers were 5′10″ and 5′11″. (*Wade* Tr. 16; Correale Aff. · Ex. 13.) Roldan's skin color was lighter than three of the four other fillers, and he had a different hair style than two of the others. (*Wade* Tr. 59; Correale Aff. Ex. 13.) Roldan weighed 200 pounds, while two of the fillers weighed 150 and 154 pounds, and two other fillers weighed 180 and 192 pounds. (Correale Aff. Ex. 13.)

40–41.) Officer Candelaria noticed Roldan and David Gonzalez Rodriguez, who fit Syoum's description of the robbers, at the far end of the platform. (*Wade* Tr. 33–34, 42.) As Roldan and Gonzalez Rodriguez walked towards Officer Torres and Syoum, Syoum unhesitatingly told the officers "that is definitely them." (*Wade* Tr. 33, 35, 43, 46, 53, 71, 77, 80.) Officer Torres frisked Roldan and recovered a small caliber handgun from Roldan's jacket pocket. (*Wade* Tr. 34, 75.)

Abelard identified Roldan in the lineup. (*Wade* Tr. 10, 16.)

At the *Wade* hearing, the defense alleged that the lineup was "unduly suggestive and that any in-court identification would therefore be tainted by the alleged prejudicial identification." (*See* 7/11/86 Opinion of Justice Fried on the *Wade* issues, at 1.) The trial court held that the lineup was not suggestive:

> Here, viewing the totality of the circumstances, it is clear that the police did not act in an impermissibly prejudicial manner....
>
> With regard to the actual composition of the lineup, *Roldan's physical appearance was not so distinguishable from that of the others in the lineup as to make the lineup unduly suggestive.... Although the heights of the five men varied, this was not discernible from the sitting position in which they were viewed. The weights of two of the fillers were close to that of Roldan. In addition to Roldan, two of the fillers had short, dark hair, while all the men had dark hair. Everybody in the lineup had a moustache. Roldan was not the only [H]ispanic in the lineup, nor was he the only one with a light complexion. Nobody was required to don any particular clothing, nor was anybody asked to speak during the lineup identification.* While the physical appearance of the fillers could have been closer, they were not so dissimilar as to be unduly suggestive.

Accordingly, the motion to suppress the subway platform identification of both defendants and the pre-arraignment lineup identification of defendant Roldan are denied.[2] Also denied is the

The officers showed the gun to Syoum, who confirmed that it was the weapon used in his robbery. (*Wade* Tr. 36.) Officer Candelaria took the gun and vouchered it, then he and Officer Torres arrested Roldan and Rodriguez. (*Wade* Tr. 34, 79.)

**2.** The Court explained that as to the subway station show-up, "it was neither suggestive nor police arranged.... It is well-settled that prompt on-the-scene identification of perpe-

motion to suppress any in-court identifications.

(7/11/86 *Wade* Opinion of Justice Fried, at 6–8, emphasis added.)

### The Molineux Hearing

On September 2, 1986, a pretrial *Molineux* hearing was held to determine the admissibility of evidence concerning Roldan's robberies of cab drivers Abelard and Syoum. The State sought to introduce evidence of the robberies on two separate theories: to establish Roldan's identity, and to show a common scheme or plan. (9/3/86 *Molineux* Tr. 9–10, 12–13.) [3]

The trial court held that the prior robberies were not admissible under *Molineux* unless the defense opened the door, but that Abelard and Syoum could testify that they saw Roldan with the murder weapon:

[T]he Court finds there is no common scheme or plan within the acception [sic] to the judicially created rule, [which] does not permit evidence of uncharged crimes to be admitted unless it fits within one of the so-called exceptions enunciated in *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286 and progeny, such as *People v. [Fiore]*, 34 N.Y.2d [81, 356 N.Y.S.2d 38, 312 N.E.2d 174].

With respect to the identification or identity exception enunciated in *Molineux* and progeny, the Court feels *evidence of the two alleged robberies in Manhattan will not be admissible since there was nothing unique about those other crimes, nor was there any distinctive modus operandi or other fact to set this defendant's crimes apart from the ordinary. People v. Kennedy*, 27 N.Y.2d, 551, 313 N.Y.S.2d 123, 261

N.E.2d 264; *People v. Allweiss*, 48 N.Y.2d, 40, 421 N.Y.S.2d 341, 396 N.E.2d 735; *People v. Beam*, 57 N.Y.2d 241, 455 N.Y.S.2d 575, 441 N.E.2d 1093 (1982).

*Accordingly, the People will not be allow[ed] to introduce on their direct case evidence concerning the two Manhattan robberies, unless the defendant opens the door.*

*The Court will allow the People to show, if the witnesses can so testify, that the driver [who] was allegedly robbed at approximately 1:45, saw the gun in Mr. Roldan's possession.* He could testify that is the gun or looks like the gun that he saw Mr. Roldan possessing at that time.

*The Court will also allow the People to elicit evidence from the second cab driver that Mr. Roldan was in possession of the gun when caught.* When the Court refers to "the gun," I am talking about the gun ultimately recovered from Mr. Roldan at approximately 3:34 A.M. on July 6, 1985 at the subway station on Allen Street in which the People have told the Court ballistic evidence will establish it to be the very same gun which killed Mr. Cummings.

*Again, no evidence will be admitted concerning the fact of the robbery, but these two witnesses can testify that they were cab drivers and said they saw the gun in Mr. Roldan's possession.*

*The police officers can testify they recovered the gun from the pocket of a jacket which he saw Mr. Roldan describe on the subway station* at Houston and Allen, approximately 3:45 in the afternoon—and *I will give the [jury] appropriate curative instructions as to*

---

trators by crime victims is a proper, permissible and responsible police practice as long as the identification immediately follows the alleged offense, and is without any suggestion or prejudicial action on the part of the police." (*Id.* at 7.)

**3.** During the course of the *Molineux* hearing, Roldan's co-defendant, David Gonzalez Rod-

riguez, pleaded guilty to first degree robbery. (9/4/86 *Molineux* Tr. at 37, 46–47.) During his plea allocution, Rodriguez identified Roldan as his confederate and as the person who shot cab driver Cummings during a struggle over the gun. (9/4/86 *Molineux* Tr. 44–46.) Roldan consequently became the sole defendant tried for Roscoe Cummings's murder.

*how they may consider that evidence that is solely on the issue of identity.* (9/4/86 *Molineux* Tr. 50–52, emphasis added.)

### Roldan's Conviction and Sentencing

On September 16, 1986, the jury convicted Roldan of second degree murder. (9/16/96 Verdict Tr. 3–5; Pet. ¶¶ 1–4.) On October 7, 1986, the trial court sentenced Roldan to twenty-five years to life imprisonment. (10/7/86 Sentence Tr. 7; Pet. ¶¶ 1–4; *see also* Correale Aff. ¶ 5.)

### Roldan's Direct State Appeal

The First Department affirmed Roldan's conviction without opinion on November 29, 1988. *People v. Roldan*, 144 A.D.2d 1043, 535 N.Y.S.2d 509 (1st Dep't 1988) (table). (*See* Pet. ¶ 9(a)—(d); *see also* Correale Aff. ¶¶ 6–8 & Ex. 3.) The New York Court of Appeals denied leave to appeal on February 2, 1989. *People v. Roldan*, 73 N.Y.2d 926, 539 N.Y.S.2d 310, 536 N.E.2d 639 (1989) (table). (*See* Pet. ¶ 9(e); *see also* Correale Aff. ¶ 9 & Ex. 4.)

### Roldan's State Collateral Attacks

On May 27, 1991, Roldan filed a pro se CPL § 440.10 motion alleging ineffective assistance of trial counsel. (Pet. ¶ 11(a); Correale Aff. ¶ 10 & Ex. 5.) On July 25, 1991, the trial court denied the motion without opinion. (Pet. ¶ 11(a); Correale Aff. ¶ 12 & Ex. 7.) On January 23, 1992, the First Department denied leave to appeal. (Correale Aff. ¶ 13 & Ex. 8.)

On December 18, 1992, Roldan filed a second pro se CPL § 440.10 motion, based on allegedly newly discovered exculpatory evidence. (Correale Aff. ¶ 14 & Ex. 9; Pet. ¶ 11(b).) The trial court denied the motion on February 16, 1993. (Correale Aff. ¶ 16 & Ex. 11; Pet. ¶ 11(b).) On April 22, 1993, the First Department denied leave to appeal. (Correale Aff. ¶ 17 & Ex. 12.)

### Roldan's Federal Habeas Petition and Federal Court Proceedings

Roldan's federal habeas petition, dated March 18, 1997 and received by the Court's Pro Se Office on March 27, 1997, alleged four grounds: (1) his guilt was not proven beyond a reasonable doubt (Pet. ¶ 12(A)); (2) the line-up during which he was identified was impermissibly suggestive (Pet. ¶ 12(B)); (3) the court improperly admitted uncharged crimes evidence (Pet. ¶ 12(C)); and (4) the state court's denial of his newly discovered exculpatory evidence motion violated due process (Pet. ¶ 12(D)).

The State argued that Roldan's petition was untimely under the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations (State Br. at 5–8) and that the petition was "mixed" because Roldan's fourth habeas ground had not been raised in state court (State Br. at 9–11). In response to the government's arguments, Roldan dropped his fourth habeas ground. (Stip. & Order dated 7/22/97.) *See Roldan v. Artuz*, 976 F.Supp. 251, 252 (S.D.N.Y. 1997) (Batts, D.J. & Peck, M.J.).

On September 4, 1997, this Court dismissed Roldan's petition as untimely under the AEDPA statute of limitations, as then-interpreted by the Second Circuit in *Peterson v. Demskie*, 107 F.3d 92, 93 (2d Cir. 1997). *See Roldan v. Artuz*, 976 F.Supp. at 253–54. On December 17, 1998, Second Circuit remanded in light of its decision in *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998), that a state prisoner whose conviction became final before the AEDPA's April 24, 1996 effective date had until April 24, 1997 to file a habeas petition. *See Roldan v. Artuz*, No. 97–2936, slip op. (2d Cir. Dec. 17, 1998).

Because Roldan's petition is timely under *Ross*, the Court now addresses the merits of his petition.

### ANALYSIS

### I. THE CIRCUMSTANTIAL EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT FOR THE JURY TO FIND ROLDAN GUILTY BEYOND A REASONABLE DOUBT

"[T]he Due Process Clause of the Fourteenth Amendment protects a defen-

dant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) (*quoting In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970)). However, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt ...." *Jackson v. Virginia,* 443 U.S. at 317, 99 S.Ct. at 2788. Accordingly, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 324, 99 S.Ct. at 2791–92; accord, e.g., *Franza v. Stinson,* 98 Civ. 5484, 1999 WL 495902 at *11 (S.D.N.Y. July 1, 1999) (Kaplan, D.J. & Peck, M.J.); *Carromero v. Strack,* 98 Civ. 3519, 1998 WL 849321 at *4 (S.D.N.Y. Nov.19, 1998) (Preska, D.J. & Peck, M.J.); *Fernandez v. Dufrain,* 11 F.Supp.2d 407, 416 (S.D.N.Y. 1998) (Kaplan, D.J. & Peck, M.J.); *Williams v. Bennet,* 97 Civ. 1628, 1998 WL 236222 at *4 (S.D.N.Y. April 20, 1998) (Baer, D.J. & Peck, M.J.); *Robinson v. Warden of James A. Thomas Ctr.,* 984 F.Supp. 801, 805 (S.D.N.Y.1997) (Sprizzo, D.J. & Peck, M.J.); *Ehinger v. Miller,* 942 F.Supp. 925, 935 (S.D.N.Y.1996) (Mukasey, D.J. & Peck, M.J.); *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.1996) (Jones, D.J. & Peck, M.J.).

Petitioner Roldan bears a "very heavy burden":

> [T]he standard for appellate review of an insufficiency claim placed a "very heavy burden" on the appellant. Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. In making this determination, we must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor.

*United States v. Carson,* 702 F.2d 351, 361 (2d Cir.1983) (citations omitted), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *accord, e.g., United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.) (quoting *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir.), *cert. denied,* 516 U.S. 1001, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995)), *cert. denied,* 519 U.S. 927, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996); *United States v. Rosa,* 11 F.3d 315, 337 (2d Cir.1993) ("[D]efendant who makes a sufficiency challenge bears a heavy burden."), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211(1994); *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993) (burden on defendant claiming insufficiency is " 'very heavy' " and all inferences must be drawn in the government's favor); *Franza v. Stinson,* 1999 WL 495902 at *11; *Carromero v. Strack,* 1998 WL 849321 at *4; *Fernandez v. Dufrain,* 11 F.Supp.2d at 416; *Williams v. Bennet,* 1998 WL 236222 at *5; *Robinson v. Warden,* 984 F.Supp. at 806; *Ehinger v. Miller,* 942 F.Supp. at 935; *Vera v. Hanslmaier,* 928 F.Supp. at 284.

The Court's review of the jury's findings is limited:

> [T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia,* 443 U.S. at 318–19, 99 S.Ct. at 2789 (quotations and citations omitted); *accord, e.g., United States v. Russo,* 74 F.3d at 1395 (quoting *United States v. Martinez,* 54 F.3d at 1042–43); *Franza v. Stinson,* 1999 WL 495902 at *11; *Mallette v. Scully,* 752 F.2d 26, 31 (2d Cir.1984); *Carromero v. Strack,* 1998 WL 849321 at *5; *Williams v. Bennet,* 1998 WL 236222 at *4; *Robinson v. Warden,* 984 F.Supp. at 806; *Ehinger v. Miller,* 942 F.Supp. at 935; *Vera v. Hanslmaier,* 928 F.Supp. at 284. "Moreover, the jury's verdict may be based entirely on circumstantial evidence." *United States v. Russo,* 74 F.3d at 1395 (citing *United States v. Martinez,* 54 F.3d at 1042–43).

■ Roldan argues that the People's case was "wholly circumstantial." (Pet. ¶ 12(A).) Roldan emphasizes that evidence showed that he gave Rodriguez the gun on the day Cummings was shot (Tr. 352–54, 357–58, 385–86, 389–91, 393–94), to avoid bringing the weapon into his mother's apartment. (Pet.¶ 12(A).) Roldan's petition claims that when he met up with Rodriguez later in the evening and took the gun back, he was unaware that Rodriguez had used it in the Cummings shooting. (Pet.¶ 12(A)).[4]

The problem with Roldan's argument is that it relies only on the defense case, viewed in the light most favorable to Roldan, and ignores the prosecution's evidence. Abelard and Syoum both stated that they saw Roldan with the gun within three hours of Cummings's murder. (Tr. 149–52, 162, 226–32.) Officers Candelaria and Torres recovered the gun from Roldan's possession on the same morning. (Tr. 114–15, 119–20.) When he was arrested, Roldan was with David Rodriguez. (Tr. 116–17.) In addition, the robbery and shooting was committed in accordance with Rodriguez's plan, announced by Rodriguez earlier in the day to George Rivera, to rob taxi drivers at gunpoint while they drove from Manhattan to the Bronx. (*See* Tr. 171–72.)

A reasonable jury could believe such testimony and find it sufficient to connect Roldan to the robbery and shooting of cab driver Roscoe Cummings. *See, e.g., Maldonado v. Scully,* 86 F.3d 32, 36 (2d Cir. 1996) (rejecting petitioner's § 2254 claim that his conviction was invalid because no direct evidence established that he was an accessory to second degree murder, because "[v]iewed in its totality, the circumstantial evidence" was sufficient for a jury to find him guilty and "[g]uilt may ... be proved entirely by circumstantial evidence ... and a lack of direct evidence does not preclude a conviction on circumstantial evidence"); *United States v. Russo,* 74 F.3d at 1395 ("ample" circumstantial evidence established the defendants' participation in and knowledge of the planning and execution of securities violations); *Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994) (rejecting petitioner's § 2254 claim that the evidence was insufficient since no physical evidence tied them to the murder, because " 'a conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness' credibility' "), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995); *Panaro v. Kelly,* 32 F.Supp.2d 105, 109 (W.D.N.Y.1998) (circumstantial evidence was sufficient to establish that petitioner was guilty of murder in the second degree beyond a reasonable doubt); *Franza v. Stinson,* 1999 WL 495902 at *12 (circumstantial evidence including petitioner's handwriting on flower box left at crime scene sufficient to prove guilt beyond a reasonable doubt); *Fernandez v. Dufrain,* 11 F.Supp.2d at 417–18 ("the circumstantial evidence was sufficient for a jury to properly conclude that [petitioner] intended to kill [the deceased]").

---

4. There was no evidence at trial to support Roldan's assertion that he gave Rodriguez the gun to avoid bringing it into his mother's apartment or that he was unaware that Rodriguez had used it in the Cummings shooting. The trial evidence does not indicate how or when Rodriguez returned the gun to Roldan.

The jury chose not to credit Arteaga's, Cruz' and Irma Roldan's testimony that Roldan was at his mother's apartment at the time the Cummings' shooting took place, despite the State's inability to account for Roldan's whereabouts at all times. The "jury is exclusively responsible for determining a witness' credibility." *United States v. Strauss*, 999 F.2d at 696 (*citing United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989)); *accord, e.g., United States v. Rosa*, 11 F.3d at 337; *Franza v. Stinson*, 1999 WL 495902 at *12; *Carromero v. Strack*, 1998 WL 849321 at *5; *Fernandez v. Dufrain*, 11 F.Supp.2d at 416; *Williams v. Bennet*, 1998 WL 236222 at *4; *Robinson v. Warden*, 984 F.Supp. at 806; *Ehinger v. Miller*, 942 F.Supp. at 935; *Vera v. Hanslmaier*, 928 F.Supp. at 284. This Court may not reassess the jury's finding of credibility: " '[f]ederal habeas courts are not free to reassess the fact specific credibility judgments by juries or to weigh conflicting testimony. On collateral review this Court must presume that the jury resolved any questions of credibility in favor of the prosecution.' " *Vera v. Hanslmaier*, 928 F.Supp. at 284 (quoting *Anderson v. Senkowski*, No. CV–92–1007, 1992 WL 225576 at *3 (E.D.N.Y.1992), *aff'd*, 992 F.2d 320 (2d Cir.1993)); *accord, e.g., Franza v. Stinson*, 58 F.Supp.2d 124, 138; *Carromero v. Strack*, 1998 WL 849321 at *5; *Fernandez v. Dufrain*, 11 F.Supp.2d at 416–17; *Williams v. Bennet*, 1998 WL 236222 at *5; *Robinson v. Warden*, 984 F.Supp. at 806; *Ehinger v. Miller*, 942 F.Supp. at 935; *see also, e.g., United States v. Birrell*, 447 F.2d 1168, 1173 (2d Cir.1971) (where inconsistency in testimony was minor and "all that was involved was faulty memory on a comparatively insignificant point," inconsistency was a jury question that does not create a "reasonable doubt as to defendant's guilt as a matter of law."), *cert. denied*, 404 U.S. 1025, 92 S.Ct. 675, 30 L.Ed.2d 675 (1972); *Fagon v. Bara*, 717 F.Supp. 976, 979 (E.D.N.Y.1989) (habeas court "is not free to make credibility judg-ments about the testimony presented at petitioner's trial or to weigh conflicting testimony.").

Here, as in prior cases, "the jury's decision was largely a matter of choosing whether to believe [the defense witnesses's] version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses, despite the inconsistencies in the evidence .... We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence." *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981); *accord, e.g., Franza v. Stinson*, 1999 WL 495902 at *13; *Carromero v. Strack*, 1998 WL 849321 at *6; *Williams v. Bennet*, 1998 WL 236222 at *5; *Robinson v. Warden*, 984 F.Supp. at 806; *Ehinger v. Miller*, 942 F.Supp. at 935; *Vera v. Hanslmaier*, 928 F.Supp. at 284. The jury here obviously resolved the conflicting versions of events and disbelieved the defense's version.

Finally, the Court notes that the AEDPA has further limited this Court's role in determining sufficiency of the evidence habeas petitions. The AEDPA amended 28 U.S.C. § 2254(d) to provide that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For the reasons stated above, this Court cannot say that the First Department's decision that the evidence was sufficient to convict Roldan of murder was contrary to established federal law or was based on an unreasonable determination of the facts. *See, e.g. Van Straten v. Schwartz,* 38 F.Supp.2d 1038, 1041 (E.D.Wis.1999) ("[F]acts found by a state court are presumed to be correct unless the petitioner rebuts this presumption with clear and convincing evidence."); *Carromero v. Strack,* 1998 WL 849321 at *7–8; *Fernandez v. Dufrain,* 11 F.Supp.2d at 418 (in view of the AEDPA, "a habeas petition may be granted for evidence insufficiency only where the state courts have unreasonably applied the standard set forth in *Jackson" v. Virginia*) (quoting *Mobley v. Stinson,* 94 Civ. 5911, 1997 WL 80587 at *2 (S.D.N.Y. Fed. 26, 1997)); *Williams v. Bennet,* 1998 WL 236222 at *5–6; *see also, e.g., Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir.1998) ("State court factual determinations shall be presumed correct unless rebutted by 'clear and convincing evidence.' 28 U.S.C. § 2254(e)(1). Furthermore, when a petitioner challenges the application of law to fact, AEDPA permits federal court relief 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect.' ") (citation omitted), *cert. denied,* —— U.S. ——, 119 S.Ct. 1339, 143 L.Ed.2d 503 (1999); *Gomez v. Acevedo,* 106 F.3d 192, 199 (7th Cir.1997) ("Because *Jackson [v. Virginia* sufficiency of the evidence] claims are mixed questions of law and fact, we are compelled to hold that a writ of habeas corpus may be issued for evidence insufficiency only if the state courts have unreasonably applied the *Jackson* standard. Federal. review of these claims therefore now turns on

whether the state court provided fair process and engaged in reasoned, good-faith decisionmaking when applying *Jackson's* 'no rational trier of fact' test."), *vacated & remanded on other grounds,* 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997); *Smith v. Vaughn,* No. Civ. A. 96–8482, 1997 WL 338851 at *7 (E.D.Pa. June 17, 1997) (same).[5]

## II. ROLDAN'S LINEUP WAS NOT UNDULY SUGGESTIVE

### A. Legal Standards

■ A defendant's right to due process includes the right not to be the object of pretrial identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *accord, e.g., Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 106 n. 9, 114, 97 S.Ct. 2243, 2249 n. 9, 2253, 53 L.Ed.2d 140 (1977); *United States v. Smith,* No. 97–1273, 152 F.3d 921 (table), 1998 WL 398813 at *1 (2d Cir. June 5, 1998); *United States v. Eltayib,* 88 F.3d 157, 166–67 (2d Cir.), *cert. denied,* 519 U.S. 1045, 117 S.Ct. 619, 136 L.Ed.2d 543 (1996); *Yearwood v. Keane,* No. 95–2404, 101 F.3d 685 (table), 1996 WL 282134 at *1 (2d Cir. May 29, 1996); *United States v. Thai,* 29 F.3d 785, 807 (2d Cir.), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *United States v. Rosa,* 11 F.3d 315, 330 (2d Cir.1993); *United States v. Concepcion,* 983 F.2d 369, 377 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *Sales v. Harris,* 675 F.2d 532, 537–38 (2d Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982).[6]

**5.** *But cf. Jones v. Wood,* 114 F.3d 1002, 1013 (9th Cir.1997) ("[T]he district court's duty to ascertain the sufficiency of the evidence by engaging in a thorough review of the complete state court record is unaffected by the AEDPA. Without such a review of the record,

it is impossible to determine whether the state court adjudication rested on an 'unreasonable application' of clearly established federal law or an 'unreasonable determination' of fact.").

**6.** *See also, e.g., United States v. Volpe,* 42 F.Supp.2d 204, 222 (E.D.N.Y. Mar.3,1999);

▮ In determining whether a lineup (or show-up or photo identification) is unduly suggestive, the reviewing court must consider the totality of the circumstances. *See, e.g., Manson v. Brathwaite,* 432 U.S. at 113–14, 97 S.Ct. at 2252–53; *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382; *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *United States v. Eltayib,* 88 F.3d at 167; *United States v. Concepcion,* 983 F.2d at 377; *United States ex rel. Pella v. Reid,* 527 F.2d 380, 384 (2d Cir.1975); *United States v. Williams,* 999 F.Supp. at 414; *Hodge v. Henderson,* 761 F.Supp. at 1007; *United States v. Porter,* 430 F.Supp. 208, 211 (W.D.N.Y.1977). " 'Police stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required.' " *Gossett v. Henderson,* 87 Civ. 5878, 1991 WL 135601 at *2 (S.D.N.Y. July, 18 1991), *aff'd,* 978 F.2d 705 (2d Cir.1992), *cert. denied,* 510 U.S. 997, 114 S.Ct. 564, 126 L.Ed.2d 463 (1993). "There is no requirement that a suspect in a lineup be surrounded by people identical in appearance." *Tavarez v. LeFevre,* 649 F.Supp. 526, 530 (S.D.N.Y. 1986); *accord, e.g., Taylor v. Kuhlmann,* 36 F.Supp.2d 534, 551 (E.D.N.Y.1999); *Morillo v. Crinder,* 97 Civ. 3194, 1997 WL 724656 at *5 (S.D.N.Y. Nov.18, 1997); *Meatley v. Artuz,* 886 F.Supp. 1009, 1016 (E.D.N.Y.1995); *Connolly v. Artuz,* No. 93 CV 4470, 1995 WL 561343 at *5 (E.D.N.Y. Sept.15, 1995); *United States v. Padilla,* 94 Cr. 313, 1994 WL 681812 at *6 (S.D.N.Y. Dec.5, 1994); *Gossett v. Henderson,* 1991 WL 135601 at *2; *United States v. Porter,* 430 F.Supp. at 211 ("as Judge Friendly has recognized, there is no requirement that a defendant in a lineup must be surrounded by people nearly identical in appearance, however desirable that may be.").

▮ In order to evaluate the constitutional permissibility of in-court identification testimony based on out-of-court pretrial identification procedures, the Second Circuit has adopted a two-step inquiry:

The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in court identification testimony based on out-of-court identification procedures. [Step 1:] That inquiry "requires determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.' "

[Step 2:] If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable. The court should consider the reliability of the identification in light of the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. For both pretrial and in-court identifications, the linchpin of admissibility is reliability. However, if impermissibly suggestive procedures are not employed, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury."

*United States v. Wong,* 40 F.3d 1347, 1359 (2d Cir.1994) (citations omitted), *cert. denied,* 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995); *accord, e.g., Dunnigan v. Keane,* 137 F.3d 117, 128 (2d Cir.), *cert. denied,* — U.S. —, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998); *Yearwood v. Keane,* 1996 WL 282134 at *1; *United*

---

*United States v. Williams,* 999 F.Supp. 412, 414 (W.D.N.Y.1998); *United States v. Brown,* 94 Cr. 631, 1995 WL 464956 at *3 (S.D.N.Y. Aug.7, 1995); *Hodge v. Henderson,* 761 F.Supp. 993, 1007 (S.D.N.Y.1990), *aff'd,* 929 F.2d 61 (2d Cir.1991).

*States v. Eltayib,* 88 F.3d at 167; *United States v. Thai,* 29 F.3d at 807–08; *United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir.), *cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).[7]

## B. Application of the Legal Standards to Roldan's Lineup

### 1. Number of Lineup Fillers

■ Roldan argues that the pretrial lineup was unduly suggestive because "although ten hours had passed since [his] arrest, the line-up [was] composed of only four fillers rather than the customary five.... Petitioner in the lineup appeared drastically different from all of the fillers, he was either taller, and or lighter in complexion, heavier in weight, younger than fillers and [his] hair style was totally different." (Pet.¶ 12(B).)[8]

■ The fact that there were only four instead of five fillers does not mean that the lineup was unduly suggestive. Roldan does not have a constitutional right to be surrounded by a specific number of lineup fillers. *See, e.g., Taylor v. Kuhlmann,* 36 F.Supp.2d 534, 551 (E.D.N.Y.1999) (lineup with defendant and four fillers upheld); *United States v. Pena–Bonilla,* 998 F.Supp. 121, 123 (D.P.R.1998); *People v. Bernier,* 245 A.D.2d 137, 137–38, 666 N.Y.S.2d 161, 162 (1st Dep't 1997); *People v. Hernandez,* 164 A.D.2d 920, 921, 559 N.Y.S.2d 754, 755 (2d Dep't 1990) ("there is no per se requirement regarding the numerical composition of line-ups"); *People v. Gallant,* 150 A.D.2d 602, 603, 541

N.Y.S.2d 470, 471 (2d Dep't 1989) (four filler lineup upheld "[u]nder the totality of the circumstances"); *People v. Krel,* 154 Misc.2d 820, 823, 588 N.Y.S.2d 513, 516 (Crim. Ct. Kings Co.1991) ("[T]here is no requirement for the numerical composition of a lineup").

### 2. Height Differences

As the trial court correctly held, the fact that Roldan was taller than the other fillers was inconsequential because the lineup fillers was conducted in a seated position. (*See* 7/11/86 J. Fried *Wade* Op. at 7; Correale Aff. Ex. 13: Lineup Sheet.) *See, e.g., United States ex rel. Pella v. Reid,* 527 F.2d 380, 384 (2d Cir.1975) ("The fact that [defendant], a short man, was placed in a line-up with mostly taller men, while certainly not the most desirable procedure, does not by itself warrant a finding of unnecessary suggestiveness."); *Tavarez v. LeFevre,* 649 F.Supp. 526, 530 (S.D.N.Y. 1986) ("[S]ince all the lineup participants were seated, any height difference was substantially minimized"); *Moreno v. Kelly,* 95 Civ. 1546, 1997 WL 109526 at *9 (S.D.N.Y. March 11, 1997) ("There is also no merit to [petitioner's] claim of suggestiveness due to the difference in his height from that of the other men in the lineup. Any height difference was minimized because all of the defendants were initially seated ..."); *Jackson v. Ross,* No. Civ. 89–0591, 1989 WL 88008 at *2 (E.D.N.Y. July 26, 1989) ("To the extent that there may have been any discrepancy in the height and weight of the participants,

---

**7.** *See also, e.g., Santiago v. New York,* 97 Civ. 5076, 1998 WL 803414 at *2 (S.D.N.Y. Oct.13, 1998); *United States v. Williams,* 999 F.Supp. at 414–15; *United States v. Frank,* 97 Cr. 269, 1998 WL 292320 at *1–3 (S.D.N.Y. June 3, 1998); *Connolly v. Artuz,* 1995 WL 561343 at *4; *United States v. Brown,* 1995 WL 464956 at *3; *Nimmons v. Walker,* 92 Civ. 5782, 1995 WL 373446 at *3 (S.D.N.Y. June 21, 1995); *Boles v. Senkowski,* 878 F.Supp. 415, 420–21 (N.D.N.Y.1995).

**8.** Roldan has not challenged the "show up" identification by cab driver Syoum in the subway station immediately after Roldan's rob-

bery of Syoum. (*See* Pet. ¶ 12(B).) Nor did Roldan challenge the "show up" identification in his brief to the First Department. (*See* Correale Aff. Ex. 1: Roldan 1st Dep't Br. at 29–32.) In any event, " 'it is now settled law that prompt on-the-scene confrontation is "consistent with good police work" and does not offend the principles established in *United States v. Wade.*' " *James v. Senkowski,* 97 Civ. 3327, 1998 WL 217903 at *7 (S.D.N.Y. April 29, 1998) (Cote, D.J. & Peck, M.J.) (quoting *United States ex rel. Cummings v. Zelker,* 455 F.2d 714, 716 (2d Cir.), *cert. denied,* 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972)).

much of the difference was eliminated by the fact that the subjects were seated."); *see also, e.g., Taylor v. Kuhlmann,* 36 F.Supp.2d 534, 551 (E.D.N.Y.1999) ("[A] disparity in the height of the lineup participants will not by itself warrant a finding of unnecessary suggestiveness."); *Collins v. Scully,* 878 F.Supp. 452, 457 n. 8 (E.D.N.Y.1995) (lineup did not violate due process where only one filler was shorter than defendant); *Wright v. Smith,* 434 F.Supp. 339, 341–42 (W.D.N.Y.1977) (lineup not unduly suggestive where three of five fillers were taller than defendant), *rev'd on other grounds,* 569 F.2d 1188 (2d Cir.1978); *United States v. Porter,* 430 F.Supp. 208, 211 (W.D.N.Y.1977) (lineup not invalid although only two fillers were defendant's height and two others were over 6' tall); *Taylor v. Swenson,* 327 F.Supp. 1165, 1168 (W.D.Mo.1971), *aff'd,* 458 F.2d 593 (8th Cir.1972).[9]

### 3. *Weight Differences*

In addition, because Roldan, who was 200 pounds, weighed approximately the same as two of the fillers who were 192 and 180 pounds respectively (Correale Aff. Ex. 13), the lineup was not unduly suggestive based on disparate weights. *See, e.g., United States v. Porter,* 430 F.Supp. 208, 211 (W.D.N.Y.1977) (lineup not invalid although defendant weighed 150 pounds and all fillers weighed over 190 pounds); *Tay-*

*lor v. Swenson,* 327 F.Supp. 1165, 1168 (W.D.Mo.1971) (weight difference did not make lineup impermissibly suggestive), *aff'd,* 458 F.2d 593 (8th Cir.1972); *People v. Poey,* 260 A.D.2d 411, 689 N.Y.S.2d 509 (2d Dep't 1999) ("Despite certain age and weight disparities, the fillers were sufficiently similar to the defendant in appearance so that he was not singled out for identification."); *People v. Cheung,* 255 A.D.2d 102, 102, 683 N.Y.S.2d 470, 470 (1st Dep't 1998); *People v. Cook,* 254 A.D.2d 92, 92, 681 N.Y.S.2d 486, 486 (1st Dep't 1998); *People v. Longshore,* 249 A.D.2d 565, 566, 671 N.Y.S.2d 332, 333 (2d Dep't 1998); *People v. Folk,* 233 A.D.2d 462, 462, 650 N.Y.S.2d 272, 272 (2d Dep't 1996); *People v. Lopez,* 209 A.D.2d 442, 443, 618 N.Y.S.2d 114, 114 (2d Dep't 1994) ("the defendant's age and weight did not single him out for identification").

### 4. *Skin Tone*

■ Although Roldan's skin color was lighter than the other fillers, "Roldan was not the only Hispanic in the lineup, nor was he the only one with a light complexion." (7/11/86 J. Fried *Wade* Op. at 7.) Differential in skin color between lineup participants does not violate due process. *See, e.g., Agosto v. Kelly,* No. 88 CV 1336, 1989 WL 79484 at *3 (E.D.N.Y. July 10, 1989) ("Slight variations in complexion tone, to the extent they existed, did not create an unconstitutionally suggestive

9. For similar New York State decisions, *see, e.g., People v. Cheung,* 255 A.D.2d 102, 102, 683 N.Y.S.2d 470, 470 (1st Dep't 1998) ("In each lineup, differences in height and weight between defendant and the fillers were minimized by the seating of all participants...."); *People v. Irving,* 254 A.D.2d 302, 303, 680 N.Y.S.2d 549, 549–50 (2d Dep't 1998) ("Although some of the stand-ins were taller, their height was effectively concealed by the fact that the participants in the lineup were seated."); *People v. Cook,* 254 A.D.2d 92, 92, 681 N.Y.S.2d 486, 486 (1st Dep't 1998) ("differences in height and weight between defendant and the fillers were minimized by the fact that all participants were seated, and that otherwise all participants appeared sufficiently similar in physical characteristics so that there was no substantial likelihood that defendant would be singled out for identifica-

tion."); *People v. Longshore,* 249 A.D.2d 565, 566, 671 N.Y.S.2d 332, 333 (2d Dep't 1998) ("The height discrepancies were minimized by the fact that the participants were seated when viewed by the complainant."); *People v. Pinckney,* 220 A.D.2d 539, 539, 632 N.Y.S.2d 203, 204 (2d Dep't 1995) ("the height and weight disparity were diminished by the fact that the lineup was conducted with the participants sitting"); *People v. Garcia,* 215 A.D.2d 584, 585, 626 N.Y.S.2d 838, 839 (2d Dep't 1995) ("Any disparities in the heights of the lineup participants was remedied by the fact that the individuals were seated during the identification procedure."); *People v. Christenson,* 188 A.D.2d 659, 660, 591 N.Y.S.2d 507, 508 (2d Dep't 1992) ("the variation in their height did not render the lineup impermissibly suggestive or conducive to irreparable mistaken identification.").

pre-trial identification."); *United States v. Castellano,* 610 F.Supp. 1359, 1440 (S.D.N.Y.1985) (lineup not unduly suggestive where defendant was only participant with pock-marked complexion); *People v. Ashby,* 692 N.Y.S.2d 109, 1999 N.Y. slip op. 05709, 1999 WL 399053 at * 1 (2d Dep't June 14, 1999) ("While it is true that one of the fillers had a skin tone lighter than that of the defendant, the lineup was otherwise comprised of individuals with similar characteristics."); *People v. Stephens,* 254 A.D.2d 105, 106, 679 N.Y.S.2d 109, 109 (1st Dep't 1998) ("The variation in skin tone among the various members of the lineup was not significant ...."); *People v. Pointer,* 253 A.D.2d 500, 500, 677 N.Y.S.2d 582, 582 (2d Dep't 1998) ("Skin tone is only one of the factors to be considered in deciding 'reasonable similarity'... and differences in skin tone alone will not render a lineup unduly suggestive.").[10]

### 5. *Age Differences*

Additionally, Roldan, who was 22 at the time of the lineup, was close in age to two

of the fillers, who were 22 and 25 years old. (Correale Aff. Ex. 13.) Even if all of the lineup fillers were older, however, this is not enough to constitute an unduly suggestive lineup. *See, e.g., Castaneda v. Artuz,* No. 97 CV 2262, 1998 WL 938860 at *6 (E.D.N.Y. Nov. 18, 1998); *Edmonds v. McGinnis,* 11 F.Supp.2d 427, 431, 437 (S.D.N.Y.1998); *Hartley v. Senkowski,* No. CV 90–0395, 1992 WL 58766 at *3–4 (E.D.N.Y. Mar.18, 1992) (defendant's challenge to lineup on ground that fillers "appeared to be several years older" rejected where "all participants appear[ed] to be of approximately the same age, height, weight and coloring"); *People v. Poey,* 260 A.D.2d 411, 689 N.Y.S.2d 509, 509, 1999 N.Y. slip op. 03191 (2d Dep't April 5, 1999) ("Despite certain age and weight disparities, the fillers were sufficiently similar to the defendant in appearance so that he was not singled out for identification.").[11]

### 6. *Hair Style Differences*

█ Finally, Roldan had short, closely cropped, dark hair, and even if his hair-

---

**10.** *See also, e.g., People v. Velez,* 222 A.D.2d 625, 626, 635 N.Y.S.2d 665, 666 (2d Dep't 1995) ("The tone of one's skin is only one of the factors to be considered in determining whether the fillers are reasonably similar to the defendant and differences in skin tone alone will not render a lineup unduly suggestive."); *People v. Mendez,* 208 A.D.2d 358, 358, 617 N.Y.S.2d 5, 6 (1st Dep't 1994) ("Nor do we find any infirmity in the lineup identification arising out of a purported difference in skin tones between defendant and all the fillers, since skin tone was not a feature the witnesses had used to describe the perpetrator ... and, when considered with other descriptive features shared by defendant and the fillers, did not in any event create a substantial likelihood that defendant would be singled out for identification."); *People v. Miller,* 199 A.D.2d 422, 422–23, 605 N.Y.S.2d 342, 343 (2d Dep't 1993) ("Skin tone is only one of the factors to be considered in deciding 'reasonable similarity' ... and differences in skin tone alone will not render a lineup unduly suggestive."); *People v. Blackwell,* 186 A.D.2d 45, 46, 587 N.Y.S.2d 645, 646 (1st Dep't 1992).

**11.** *See also, e.g., People v. Cheung,* 255 A.D.2d 102, 102, 683 N.Y.S.2d 470, 470 (1st Dep't 1998) ("although there were differences in

age between defendant and the fillers, all participants appeared sufficiently similar so that there was no substantial likelihood that defendant would be singled out for identification"); *People v. Cotterell,* 251 A.D.2d 679, 679, 675 N.Y.S.2d 613, 613 (2d Dep't 1998) ("there is no merit to the defendant's contention that the lineup in which he was identified was impermissibly suggestive because he was the youngest participant"); *People v. Longshore,* 249 A.D.2d 565, 566, 671 N.Y.S.2d 332, 333 (2d Dep't 1998); *People v. Bryan,* 228 A.D.2d 244, 244, 644 N.Y.S.2d 25, 26 (1st Dep't 1996) ("Although three of the four fill-ins, ages 42, 45 and 47, were older than defendant, who was 36 at the time, and only one was her age, all appeared to be roughly the same age...."); *People v. Pinckney,* 220 A.D.2d 539, 539, 632 N.Y.S.2d 203, 204 (2d Dep't 1995) ("the age disparities between the defendant and the fillers were not so apparent as to single out the defendant"); *People v. Garcia,* 215 A.D.2d 584, 585, 626 N.Y.S.2d 838, 838 (2d Dep't 1995) ("no appreciable difference in age between the defendant and the fillers was apparent in viewing the lineup."); *People v. Baptiste,* 201 A.D.2d 659, 660, 608 N.Y.S.2d 266, 266 (2d Dep't 1994).

style was different than some of the lineup fillers, "two of the fillers had short, dark hair, while all the men had dark hair." (7/11/86 J. Fried *Wade* Op. at 7; *see* Correale Aff. Ex. 13.) Differential in hairstyles does not create an unduly suggestive lineup. *See, e.g., United States v. Jackson,* 509 F.2d 499, 505 (D.C.Cir.1974) ("[defendant's] bush hairstyle was not 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to amount to a constitutional violation," even though the fillers "haircuts diverged considerably"); *Collins v. Scully,* 878 F.Supp. 452, 457 n. 8 (E.D.N.Y.1995) (lineup did not violate due process although defendant was the only one with corn-row hair); *Wright v. Smith,* 434 F.Supp. 339, 341–42 (W.D.N.Y.1977) (lineup not unduly suggestive where three of four fillers had "Afros or bush" hairstyles while defendant and one filler had "a close-cut hair style").[12]

### 7. *The Totality of the Circumstances*

█ As the Second Circuit has explained, "[w]hen the appearance of participants in a lineup is not uniform with respect to a given characteristic, the 'principal question' in determining suggestiveness is whether the appearance 'of the accused, matching descriptions given by the witness, so stood out from all of the other[s] ... as to "suggest to an identifying witness that [that person] was more likely to be the culprit." ' " *United States v. Wong,* 40 F.3d 1347, 1359–60 (2d Cir.1994); *see also, e.g., United States v. Padilla,* 94 CR. 313, 1994 WL 681812 at *6 (S.D.N.Y. Dec.5, 1994) ("Even if there are some physical differences, a photo-array or line-up will not be suggestive so long as the other pictures or stand-ins sufficiently resembled the defendant 'to allay any concern that

the witness might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others.'"). While Abelard gave the police a description of Roldan after the robbery (*Wade* Tr. 20–21), that description is nowhere in the habeas record, so there is no evidence that Abelard was unduly influenced by any differences in appearance between Roldan and the fillers. Having viewed the lineup sheet and photograph (Correale Aff. Ex. 13), this Court agrees with the state court decision that "[w]hile the physical appearance of the fillers could have been closer, they were not so dissimilar as to be unduly suggestive." (7/11/86 J. Fried Op. at 7.)

The Court notes that pursuant to the AEDPA, "[f]ederal habeas courts reviewing state court determinations of factual matters must treat those determinations as presumptively correct, unless those findings are 'not "fairly supported by the record." ' 28 U.S.C. § 2254(d). Petitioner thus bears the burden of establishing by convincing evidence that the factual determinations by the state court were erroneous." *Taylor v. Kuhlmann,* 36 F.Supp.2d 534, 552 (E.D.N.Y.1999). As in *Taylor,* "[t]his court has reviewed the hearing testimony and photocopies of the lineup introduced at the *Wade* hearing [Correale Aff. Ex. 13] and finds that the state court's factual findings are fairly supported by the record and that the [state] courts correctly concluded that the lineup composition was not unduly suggestive." *Id.; see also, e.g., Connolly v. Artuz,* No. 93 CV 4470, 1995 WL 561343 at *5 (E.D.N.Y. Sept.15, 1995); *Collins v. Scully,* 878 F.Supp. 452, 457 (E.D.N.Y.1995); *Hartley v. Senkowski,*

---

**12.** *See also, e.g., People v. Bryan,* 228 A.D.2d 244, 244, 644 N.Y.S.2d 25, 26 (1st Dep't 1996) ("And, although the fill-in's hairstyles differed from defendant's, that fact is not significant where the complainant had merely described the robber's hair as 'short', and defendant's hairstyle was not particularly uncommon or unusual."); *People v. Berry,* 201

A.D.2d 489, 489–90, 607 N.Y.S.2d 401, 402 (2d Dep't 1994) (lineup not unduly suggestive even if defendant was the only man with braided hair); *People v. Jacobi,* 159 A.D.2d 308, 308, 552 N.Y.S.2d 587, 588 (1st Dep't 1990) (defendant's stringy hair was insufficient to constitute an unduly suggestive lineup).

No. CV–90–0395, 1992 WL 58766 at *3–4 (E.D.N.Y. Mar.18, 1992).[13]

### III. *EVIDENCE OF UNCHARGED CRIMES WAS NOT SO PREJUDICIAL AS TO VIOLATE DUE PROCESS*

■ It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' ") (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)); *see also, e.g., Benitez v. Senkowski,* 97 Civ. 7819, 1998 WL 668079 at *4 (S.D.N.Y. Sept.17, 1998) (Cote, D.J. & Peck, M.J.); *James v. Senkowski,* 97 Civ. 3327, 1998 WL 217903 at *5 (S.D.N.Y. April 29, 1998) (Cote, D.J. & Peck, M.J.); *Simmons v. Ross,* 965 F.Supp. 473, 480 (S.D.N.Y.1997). "In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue." *Roberts v. Scully,* 875 F.Supp. 182, 189 (S.D.N.Y.1995), *aff'd mem.,* 71 F.3d 406 (2d Cir.1995); *see also, e.g., Benitez v. Senkowski,* 1998 WL 668079 at *4; *James v. Senkowski,* 1998 WL 217903 at *5; *Simmons v. Ross,* 965 F.Supp. at 480.

■ "Issues regarding the admissibility of evidence in state court concern matters of state law and are not subject to federal review unless the alleged errors are so prejudicial as to constitute fundamental unfairness." *McCray v. Artuz,* 93 Civ. 5757, 1994 WL 603057 at *2 (S.D.N.Y. Nov.3, 1994); *see also, e.g., Rosario v. Kuhlman,* 839 F.2d 918, 924–25 (2d Cir. 1988) ("erroneous evidentiary rulings do not automatically rise to the level of constitutional error"; habeas courts must determine whether inclusion of evidence was an error of constitutional dimension by depriving petitioner of a fundamentally fair trial); *Benitez v. Senkowski,* 1998 WL 668079 at *4; *James v. Senkowski,* 1998 WL 217903 at *5; *Watson v. Kelly,* 91 Civ. 7925, 1996 WL 409198 at *3 (S.D.N.Y. July 22, 1996).

■ A petitioner seeking habeas relief from an allegedly erroneous evidentiary ruling bears the "heavy burden" of establishing that the trial court's error constituted a deprivation of a constitutionally recognized right such as the right to a fair trial. *Roberts v. Scully,* 875 F.Supp. at 189; *accord, e.g., Benitez v. Senkowski,* 1998 WL 668079 at *5; *James v. Senkowski,* 1998 WL 217903 at *5–6.

■ "[T]o determine whether a constitutional violation has occurred through the erroneous admission of evidence, the petitioner must show that 'the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been "crucial, critical, highly significant." ' " *Schurman v. Leonardo,* 768 F.Supp. 993, 1001 (S.D.N.Y. 1991) (quoting *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir. 1985)); *accord, e.g., Benitez v. Senkowski,* 1998 WL 668079 at *5; *James v. Senkowski,* 1998 WL 217903 at *6.

■ Roldan argues that evidence of uncharged crimes—*i.e.,* his robbery of two other cab drivers—was improperly received at trial. (Pet.¶ 12(C).) A habeas claim asserting a right to relief on *Molineux* grounds must rise to the level of constitutional violation, as required by the above standard, because *Molineux* is a state law issue. *See, e.g., Gordon v. Duran,* 895 F.2d 610, 613 (9th Cir.1990); *Butcher v. Marquez,* 758 F.2d 373, 378 (9th Cir.1985); *Singh v. Madding,* No. C 97–

---

**13.** Because the Court finds that the lineup was not impermissibly suggestive under the first step of the test, the Court need not reach the second prong as to whether the in court identification was independently reliable.

4413, 1998 WL 422331 at *3 (N.D.Cal. July 22, 1998); *Sadowski v. McCormick*, 785 F.Supp. 1417, 1419–20 (D.Mont.1992), *aff'd*, 2 F.3d 1157 (9th Cir.1993).

■ Evidence of uncharged crimes is generally inadmissable so that the jury does not convict the defendant based on a perceived predisposition towards criminal conduct that is deserving of punishment rather than for guilt of the charged offense. *E.g., People v. Molineux*, 168 N.Y. 264, 291, 61 N.E. 286 (1901); *see also, e.g., United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir.1995); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *Rios v. Hoke*, No. 85–CV–1241, 1988 WL 101013 at *3 (N.D.N.Y. Sept.19, 1988); *People v. Alvino*, 71 N.Y.2d 233, 241, 525 N.Y.S.2d 7, 11, 519 N.E.2d 808 (1987); *People v. Beam*, 57 N.Y.2d 241, 250, 455 N.Y.S.2d 575, 579–80, 441 N.E.2d 1093 (1982); *People v. Ventimiglia*, 52 N.Y.2d 350, 359, 438 N.Y.S.2d 261, 264, 420 N.E.2d 59 (1981); *People v. Allweiss*, 48 N.Y.2d 40, 46–47, 421 N.Y.S.2d 341, 344, 396 N.E.2d 735 (1979); *People v. Vails*, 43 N.Y.2d 364, 368, 401 N.Y.S.2d 479, 481, 372 N.E.2d 320 (1977); *People v. Condon*, 26 N.Y.2d 139, 143, 309 N.Y.S.2d 152, 154, 257 N.E.2d 615 (1970).[14]

■ "However, when the evidence of the other crimes is relevant to an issue other than the defendant's criminal tendency, it may be admitted on the basis of an exception to the general rule, but only for the limited purpose for which it is relevant." *People v. Beam*, 57 N.Y.2d at 250, 455 N.Y.S.2d at 579–80, 441 N.E.2d 1093; *accord, e.g., People v. Alvino*, 71 N.Y.2d at 241–42, 525 N.Y.S.2d at 11, 519 N.E.2d 808; *People v. Ventimiglia*, 52 N.Y.2d at 359–60, 438 N.Y.S.2d at 264, 420 N.E.2d 59; *People v. Allweiss*, 48 N.Y.2d at 46–47, 421 N.Y.S.2d at 344, 396 N.E.2d

735; *People v. Vails*, 43 N.Y.2d at 368, 401 N.Y.S.2d at 482, 372 N.E.2d 320; *People v. Condon*, 26 N.Y.2d at 143, 309 N.Y.S.2d at 154, 257 N.E.2d 615; *People v. Molineux*, 168 N.Y. at 293, 61 N.E. 286.

"In *People v. Molineux (supra)*, [the New York Court of Appeals] stated what has come to be known as the five *Molineux* exceptions to the rule forbidding introduction of evidence of similar crimes." *People v. Beam*, 57 N.Y.2d at 250, 455 N.Y.S.2d at 580, 441 N.E.2d 1093. The New York Court of Appeals in *Molineux* held that "[g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." *People v. Molineux*, 168 N.Y. at 293, 61 N.E. 286; *accord, e.g., People v. Alvino*, 71 N.Y.2d at 242, 525 N.Y.S.2d at 11, 519 N.E.2d 808; *People v. Ventimiglia*, 52 N.Y.2d at 359, 438 N.Y.S.2d at 264, 420 N.E.2d 59; *People v. Allweiss*, 48 N.Y.2d at 47, 421 N.Y.S.2d at 344, 396 N.E.2d 735; *People v. Vails*, 43 N.Y.2d at 368, 401 N.Y.S.2d at 482, 372 N.E.2d 320; *People v. Condon*, 26 N.Y.2d at 143, 309 N.Y.S.2d at 155, 257 N.E.2d 615.

At the pretrial *Molineux* hearing in Roldan's case, the trial court rejected the People's argument that evidence of the robberies should be admissible based on the identity and common scheme or plan exceptions set forth in *Molineux*, and its progeny, and held that the taxi drivers could testify only that they saw the gun in Roldan's possession that night and that

---

**14.** *See also, e.g., People v. Davis*, 259 A.D.2d 706, 687 N.Y.S.2d 653, 654 (2d Dep't 1999); *People v. Kanston*, 192 A.D.2d 721, 721, 597 N.Y.S.2d 152, 153 (2d Dep't 1993); *People v. Pons*, 159 A.D.2d 471, 473, 552 N.Y.S.2d 344,

345 (2d Dep't 1990); *People v. Battles*, 83 A.D.2d 164, 166, 443 N.Y.S.2d 932, 934 (4th Dep't 1981); *People v. Le Grand*, 76 A.D.2d 706, 708–09, 431 N.Y.S.2d 850, 852 (2d Dep't 1980).

Roldan possessed that gun when arrested by the police. (*Molineux* Tr. 50–52.)

▇ Roldan complains that Syoum implied that, not only had he seen Roldan in possession of a gun, but also that Roldan had robbed him. (Pet.¶ 12(C).) Syoum, however, never stated that he was robbed, testifying only as follows:

Q: What is your occupation?

A: Yellow cab, medallion driver, part time.

Q: Mr. Syoum, I would like to call your attention to the early morning hours of July 6th of 1985. I ask you to tell the jury whether or not you see someone here in the courtroom whom you also saw on that date at approximately 3:45 a.m.?

A: I think he needs to take off his glasses.

. . . .

Q: Do you see someone here?

A: That's him.

Q: Would you point him out again?

A: That's him. (pointing)

THE COURT: Indicating the defendant.

[PROSECUTOR]: Thank you.

Q: At the time you saw the defendant, Mr. Syoum, on that morning, at that hour, did he have anything in his hands?

A: Yes.

Q: What did he have?

A: He had a gun.

Q: What kind of a gun?

A: Small Beretta.

. . . .

Q: Would you please look carefully at that exhibit [People's Ex. 8], Mr. Syoum?

A: This is definitely it.

Q: Is there any doubt in your mind about that?

A: No doubt. No doubt.

Q: At the time when you saw that gun in the hand of this defendant, Mr. Sy-oum, how long did you spend looking at it, that is, the gun?

A: 20 seconds.

Q: Would you describe for the jury, just in general, the lighting conditions, were you able to see clearly?

A: Yes.

Q: Would you tell the jury approximately how close or how far the gun was from where you were at the time you saw it?

A: Very close.

Q: I'm sorry?

A: Very close.

(Tr. 150–52.) That was the extent of Syoum's direct testimony, and defense counsel wisely chose not to cross-examine. (*See* Tr. 163.)

After Syoum's testimony, the trial court denied defense counsel's motion for a mistrial (Tr. 153–61), but precluded Abelard from revealing that he was a taxi driver (Tr. 159). Roldan argues, however, that since this information was revealed in the prosecutor's opening statement, the court's limiting instruction was insufficient. (Pet. ¶ 12(C).) Additionally, Roldan argues that Abelard's testimony clearly communicated to the jury that there had been yet another taxi driver robbery. (Pet.¶ 12(C).) Abelard testified:

Q: Mr. Abelard, I ask you to think back to the early morning hours of July the 6th, 1985.

A: Yes.

Q: And to tell the jury, please, whether you see anyone here in the courtroom this afternoon whom you also saw at approximately 1:45 on that morning, July the [6]th?

A: Yes, on that day of July—

. . . .

A: I saw a black gun—

. . . .

Q: Mr. Abelard, my question is, do you see anyone in the courtroom this afternoon whom you also saw on July the

5th—withdrawn—July the 6th of 1985, at approximately 1:45 in the morning?

A: Let me take a look.

. . . .

A: No, I don't see him.

. . . .

Q: Mr. Abelard, I have asked you to look carefully at everyone in the courtroom and to tell the jury whether you see anyone here now whom you also saw at approximately 1:45 in the morning of July the 5th—withdrawn—July the 6th of 1985? The jury is awaiting your answer, sir.

A: I see somebody who looks like him.

Q: Looks like who?

A: Like the guy I saw.

Q: Looks like who?

A: The guy I saw on July 6th.

. . . .

Q: Who is that, Mr. Abelard?

A: Can I point him out?

Q: Yes, you may.

A: It looks like that guy with the glasses, like the man with the glasses.

Q: Like the man with the glasses?

A: Yeah.

. . . .

Q: Is there anything different now, Mr. Abelard, about that man's appearance?

A: The glasses.

. . . . [The court instructs that person, *i.e.,* Roldan, to remove his glasses]

Q: Do you see anyone here now in the courtroom who you saw on the morning of July 6th of 1985 at approximately 1 o'clock in the morning?

A: Yes.

Q: Who is it?

A: Him.

THE COURT: Indicating the defendant.

[PROSECUTOR]: Indicating the defendant.

Q: At the time you saw the defendant on that day, sir, did the defendant have anything in his hands?

A: He had a gun in his hand.

Q: What kind of a gun?

A: It was a small black gun.

Q: I ask you to look at what has been received in evidence as People's Exhibit 8. Do you recognize that, sir?

A: Yes, I do.

Q: What do you recognize it to be?

A: By the shape, the color and the size.

Q: I'm sorry?

A: I recognize that gun by the shape, the color and the size.

Q: Have you seen that gun before?

A: Yes.

Q: When did you see it before?

A: In the lineup.

THE COURT: Sustained. The jury will disregard it.

. . . .

Q: Is that the gun which you saw in this man's hand?

A: Yes.

. . . .

Q: When you saw the gun at that time, Mr. Abelard, how long did you look at it?

A: About sixty seconds.

Q: What were the lighting conditions, just in general, tell the jury what the lighting conditions were?

A: Good. In good condition.

Q: Were you able to see it clearly?

A: Very clear.

Q: And how close to you, or how far from you was the weapon you saw at that time?

A: About one feet away.

(Tr. 227–32.) Again, Roldan's counsel did not cross-examine. (*See* Tr. 232.) Roldan's counsel did not renew his motion for a mistrial after Abelard's testimony. (*See* Tr. 232–36.)

At most, these witnesses implied that Roldan robbed them. Implications, however, do not generally amount to evidence and therefore the taxi drivers' testimony was insufficient to constitute a ground for habeas relief. *See, e.g., United States v. Croft,* 124 F.3d 1109, 1119 (9th Cir.1997); *United States v. Sullivan,* 911 F.2d 2, 8 (7th Cir.1990); *Reid v. Lacey,* 91 Civ. 5779, 1992 WL 162988 at *4 (S.D.N.Y.1992); *Olivo v. Henderson,* 88 Civ. 4481, 1990 WL 129190 at *6 (S.D.N.Y. Aug.29, 1990).

Additionally, even if the testimony amounted to inadmissible evidence of uncharged crimes, the trial court's prompt curative instructions to the jury eliminated the risk of unfair prejudice. In response to Syoum's testimony, the judge issued the following curative instructions:

Again, ladies and gentlemen, *with respect to any evidence concerning the possession of a particular gun by the defendant on a date or at a time subsequent to the time of the alleged crimes charged in the indictment on trial here, I caution you that you are not to consider any such evidence with respect to whether this defendant has a general propensity to commit crimes.* That is, you are not to consider it more likely that the defendant committed the crimes charged in this indictment, if you find that he was subsequently in possession of a gun or, indeed, that that possession of that gun on that subsequent occasion was even illegal or that it was used illegally on any subsequent occasion.

*I instruct you that you are to consider any testimony concerning a subsequent possession of a gun by the defendant, if you find that he subsequently possessed that gun,* along with any other evidence in this case with respect thereto, *solely and only as it relates to the identification of the defendant as the perpetrator of the crimes charged in this indictment which is on trial.* That is, if you find that the defendant was, in fact, in subsequent possession of this gun, *you may consider this evidence solely and only as it bears on the identification of the defendant as the perpetrator of the crimes charged in this indictment which were allegedly committed on July 6, 1985, at approximately 12:30 or 12:40 a.m. involving Roscoe Cummings.*

(Tr. 163–64, emphasis added.)

In response to Abelard's testimony, the trial judge once again issued curative instructions:

Members of the jury, *I caution you once again, and most strenuously, that with respect to any evidence concerning the possession of a particular gun,* as has been marked in this case as People's Exhibit 8, by the defendant on the date or a time subsequent to the time of the alleged crimes charged in this indictment before you, *I caution you that you are not to consider such evidence with respect to whether this defendant has a general propensity to commit crimes; that is, you are not to consider it more likely that the defendant committed the crimes charged in this indictment if you find that he was subsequently in possession of the gun* which has been marked People's 8 in Evidence, *or indeed that the possession of that gun on some subsequent occasion was even illegal, or that it was used illegally on any subsequent occasion.*

I instruct you that *you are to consider any testimony concerning a subsequent possession of a gun,* People's 8, by this defendant, along with any other evidence in this case with respect thereto, that is with respect to said gun, *solely and only as it relates to the identification of this defendant as the perpetrator of the crimes charged in this indictment, that is the one that is now on trial.*

*That is, if you find that this defendant was in fact in subsequent possession of People's 8 in Evidence, you may consider this evidence solely and only as it bears on the identification of this defendant as the perpetrator of the crimes allegedly [committed] on July*

*6th of 1985, at approximately 12:30 or 12:45 A.M. involving Roscoe Cummings, and for no other purpose.*

(Tr. 232–34, emphasis added.)

And in his closing charge to the jury, the trial judge again reminded them that they could use evidence that Roldan possessed a gun at other times that night only for a limited purpose:

Members of the jury, I have allowed the People in this case to introduce evidence that on another occasion this defendant, Juan Roldan, was seen or found in possession of a .25 caliber automatic introduced in evidence as People's Exhibit 8. I repeat, as I did each time such evidence was admitted, that the fact that this defendant possessed the gun, if you find that he did possess this gun, at a time subsequent to the robbery and shooting of Mr. Cummings is no proof whatsoever that he possessed a propensity or disposition to commit the crimes charged in this indictment or any other crime. It is not offered for such purpose and must not be considered by you for that purpose. Instead, the People offer such evidence of the defendant's possession of People's Exhibit 8 in evidence several hours after the robbery and shooting of Mr. Cummings—I believe it was one hour and three hours—solely for the purpose of establishing the defendant's identity as one of the perpetrators of the crimes charged in the indictment on trial before you and solely as to the contentions of the prosecution. I urge you that such evidence can be considered by you only for such limited purposes of identity and for none other.

The fact that I allowed you to hear such evidence should not be considered by you that I have any opinion as to the value to prove that purpose. The sufficiency of such evidence to prove the purpose for which it is offered is solely a question for the jury. If you find it insufficient and of no value, disregard it, forget it. If you find it sufficiently probative of that purpose, you may give it such weight as you believe it deserves. It will then be your duty to consider such evidence, together with all the other evidence in the case, in deciding whether the People have proved the defendant's guilt beyond a reasonable doubt of the crimes charged in the indictment now on trial.

(Tr. 472–74.) Defense counsel did not take any exceptions to the charge. (Tr. 512–13.)

"[T]he Court must presume that the jury is capable of understanding and following limiting instructions provided during the course of and at the conclusion of the trial with regard to the manner in which it may use evidence." *United States v. De Yian,* 94 Cr. 719, 1995 WL 368445 at *11 (S.D.N.Y. June 21, 1995); *see also, e.g., Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 938–39, 122 L.Ed.2d 317 (1993); *Greer v. Miller,* 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987); *Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987) ("with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering into the path of inference in the first place, so that there is no incrimination to forget"); *Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985); *Marshall v. Lonberger,* 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983); *Watkins v. Sowders,* 449 U.S. 341, 347–48, 101 S.Ct. 654, 658–59, 66 L.Ed.2d 549 (1981); *Delli Paoli v. United States,* 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278 (1957) ("Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense."); *United States v. Romero,* 54 F.3d 56, 60 (2d Cir. 1995), *cert. denied,* 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996); *United States v. Coffey,* 823 F.2d 25, 28 (2d Cir. 1987) ("These prompt curative instructions

sufficed to eliminate any unfair prejudice that might have resulted from a fact being placed unfairly before the jury."); *United States v. Pena*, 793 F.2d 486, 491 (2d Cir. 1986); *United States v. Ebner*, 782 F.2d 1120, 1126 (2d. Cir.1986) ("Such limiting instructions are " 'an accepted part of our present trial system,' " ... and consequently there is a 'presumption that juries will follow [them].' "); *United States v. Bernard*, No. 3:97CR48, 1998 WL 241205 at *7 (D.Conn. April 2, 1998); *Aziz v. Warden of Clinton Correctional Facility*, 92 Civ. 0104, 1992 WL 249888 at *8 (S.D.N.Y. Sept.23, 1992), *aff'd*, 993 F.2d 1533 (2d Cir.), *cert. denied*, 510 U.S. 888, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993); *Travison v. Jones*, 522 F.Supp. 666, 669–70 (N.D.N.Y.1981) ("In view of this clear and unqualified instruction, it is difficult to accept the contention that petitioner was deprived of a fair trial in violation of federal constitutional rights. The premise upon which our jury system is founded is that a jury accepts and follows clear instructions of the trial judge.").[15]

Taking the record as a whole, the trial court's limiting instructions cured any prejudicial effect the testimony may have had. *See, e.g., Benitez v. Senkowski*, 97 Civ. 7819, 1998 WL 668079 at *6 (S.D.N.Y. Sept.17, 1998) (Cote, D.J. & Peck, M.J.) ("Moreover, taking the record as a whole, the trial court's limiting instruction and jury charge cured any prejudicial effect the testimony may have had."); *Harris v. Hollins*, 97 Civ. 4376, 1997 WL 633440 at *3 (S.D.N.Y. Oct.14, 1997) ("the court's curative instruction ameliorated any prejudicial effect the testimony may have had"); *Aziz v. Warden of Clinton Correctional Facility*, 1992 WL 249888 at *8 (" 'any prejudice to defendant which may have been occasioned by the witness' remark was rendered harmless by the court's curative instructions' "); *Angulo v. Kelly*, 91 Civ. 1707, 1992 WL 110765 at *3 (S.D.N.Y. May 4, 1992) ("The trial court also instructed the jury to disregard several of these statements, thus, eliminating any possible prejudice to the defendant.").[16]

**15.** *See also, e.g., People v. Berg*, 59 N.Y.2d 294, 299–300, 464 N.Y.S.2d 703, 451 N.E.2d 450 (1983); *People v. Hernandez*, 240 A.D.2d 759, 759, 660 N.Y.S.2d 1004, 1005 (2d Dep't 1997) ("While evidence of uncharged crimes generally should not be admitted, ... any potential prejudice to the defendant here was alleviated by the court's curative instructions."); *People v. Murphy*, 235 A.D.2d 933, 935, 654 N.Y.S.2d 187, 191 (3d Dep't 1997) (trial court "minimized prejudicial effect of the testimony [about other crimes] by providing the jury with appropriate limiting instructions."); *People v. Reed*, 215 A.D.2d 209, 209, 626 N.Y.S.2d 765, 766 (1st Dep't 1995); *People v. Gilliard*, 171 A.D.2d 531, 532, 567 N.Y.S.2d 429, 430 (1st Dep't) ("any prejudice to defendant which may have been occasioned by the witness' remark [about a prior robbery] was rendered harmless by the court's curative instruction"), *appeal denied*, 77 N.Y.2d 995, 571 N.Y.S.2d 921, 575 N.E.2d 407 (1991); *People v. Panepinto*, 161 A.D.2d 1192, 1192, 555 N.Y.S.2d 525, 525 (4th Dep't 1990) (the court's prompt and complete instructions to the jury were sufficient to cure any error from reference to uncharged crimes); *People v. Allen*, 135 A.D.2d 823, 823, 522 N.Y.S.2d 926, 926 (2d Dep't 1987); *People v. Banks*, 130 A.D.2d 498, 499, 515 N.Y.S.2d 81, 81 (2d Dep't 1987).

**16.** *See also, e.g., People v. Santiago*, 52 N.Y.2d 865, 866, 437 N.Y.S.2d 75, 76, 418 N.E.2d 668 (1981) ("Any prejudice to the defendant which might have arisen due to brief mention of uncharged criminal activity which was made at defendant's trial was alleviated when the court sustained defendant's objections and took prompt curative action."); *People v. De-Jesus*, 260 A.D.2d 301, 690 N.Y.S.2d 178, 1999 N.Y. Slip Op. 03649, 1999 WL 251328 at *1 (1st Dep't April 27, 1999) ("The court properly exercised its discretion in denying defendant's motion for a mistrial made on the basis of a reference to uncharged crimes, since any possible prejudice to defendant was obviated by the court's prompt curative instruction."); *People v. Diaz*, 254 A.D.2d 104, 104, 679 N.Y.S.2d 285, 285 (1st Dep't 1998), *People v. Hernandez*, 240 A.D.2d at 759, 660 N.Y.S.2d at 1005 ("While evidence of uncharged crimes generally should not be admitted ..., any potential prejudice to the defendant here was alleviated by the court's curative instructions."); *People v. Gilliard*, 171 A.D.2d 531, 532, 567 N.Y.S.2d 429, 430 (1st Dep't 1991) (witness' testimony about defendant's commission of previous robbery was rendered harmless by the court's curative instruction).

## CONCLUSION

For the reasons set forth above, I recommend that the Court deny petitioner Roldan's habeas corpus petition.

## *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993), *cert. denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).